IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 26, 2021 Session

**STATE OF TENNESSEE V. TERRANCE REECE**

**Appeal from the Criminal Court for Knox County**
**No. 113740   Steven Wayne Sword, Judge**

_____

**No. E2020-01589-CCA-R3-CD**

_____


The Defendant, Terrance Reece, was convicted by a Knox County Criminal Court jury of unlawful possession of a handgun by a convicted felon, a Class E felony; unlawful possession of a firearm by a felony drug offender, a Class D felony; unlawful possession of a firearm having been convicted of a felony involving the use of force or violence, a Class C felony; unlawful possession of a firearm having been convicted of a felony involving the use of force, violence, or a deadly weapon, a Class C felony; vandalism of property valued at $1,000 or less, a Class A misdemeanor; and three counts of aggravated assault, a Class C felony. After merging the firearms counts, the trial court sentenced the Defendant to an effective term of twenty-two years in the Department of Correction, with the first twelve years to be served at 60% as a career offender and the last ten years at 45% as a persistent offender. The Defendant raises the following issues on appeal: 1) whether the trial court erred by its sua sponte mid-trial hearing to address an allegation that the Defendant threatened a witness during a break in the trial, by revoking the Defendant's bond as a result of the alleged threat, and by allowing evidence of the alleged threat to be introduced at trial; 2) whether the trial court admitted prejudicial and irrelevant evidence in the form of testimony about a bullet found in the Defendant's pocket at the time of his arrest that was discarded by the police, unredacted 911 calls by one of the alleged victims, and copies of the Defendant's prior Michigan judgments; and 3) whether the evidence was sufficient to sustain the felony convictions. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JILL BARTEE AYERS, JJ., joined.

Chelsea C. Moore, Knoxville, Tennessee (on appeal) and Rachel Lambert, Knoxville, Tennessee (at trial), for the appellant, Terrance L. Reece.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

According to the State's proof at trial, on the afternoon of April 28, 2018, the Defendant's estranged girlfriend, Jacqueline Solomon, who had recently moved out of the Oak Ridge apartment she shared with the Defendant, was transferring her belongings into a storage shed on her parents' Knoxville property when the angry Defendant came to the property, brandished a handgun, and threatened to kill Jacqueline,[1] Jacqueline's mother, Giselle Solomon, and Jacqueline's sister, Kallie Solomon. Mrs. Solomon pointed her own handgun at the Defendant and told him to leave, and he turned to go. Before departing, however, he kicked over the Solomons' mailbox and brandished his handgun at Jacqueline's father, Ronald Solomon, who was pulling up to the property as the Defendant was leaving. A short time later, the Defendant was arrested by an officer with the Oak Ridge Police Department, who found a .40 caliber bullet in the Defendant's pocket but no weapon on his person or in his vehicle. The Defendant was subsequently charged in a seventeen-count indictment with the aggravated assaults of Jacqueline, Giselle, Ronald, and Kallie Solomon, misdemeanor vandalism, four counts involving his possession of the gun after having been previously convicted of various felony offenses, and various counts under the gang-enhancement statute. The State, however, ultimately dismissed the gang-enhancement counts of the indictment.

The State's first witness at the Defendant's September 3-5, 2019 trial was Michael Alan Mays of the Knox County Emergency Communications District 911, who identified the 911 calls made by Jacqueline Solomon about the incident, as well as the "CAD" or "computer-aided dispatch" log of those calls, all of which were admitted as exhibits and published to the jury. According to his records, the first call was received at 1:57 p.m. on April 28, 2018, and the second call was received at 3:18 p.m. the same day. Mr. Mays was unable to find the record of a 911 call made from Mr. Solomon's cell phone.

Giselle Solomon testified that Ronald Solomon was her husband, and that her three children were thirty-year-old Jacqueline Solomon, her twenty-seven-year-old son, RJ

---

[1] Because the victims in this case all share the same last name, we will at times refer to the younger members of the family by their first names only. We intend no disrespect in doing so.

Solomon, and her fourteen-year-old daughter, Kallie Solomon. The family residence was on Fay Street in Knox County, but she and her husband also owned a rental house on Joyce Avenue, located around the corner. The Defendant was Jacqueline's on-again, off-again live-in boyfriend, with the couple having shared an Oak Ridge apartment until approximately two weeks before the incident, when Jaqueline left with a few of her personal belongings and moved back into the family home on Fay Street.

Mrs. Solomon testified that on the day of the incident, the family went with Jacqueline and an Oak Ridge police escort to the apartment to retrieve the rest of Jaqueline's belongings. The Defendant was not at home, and the Oak Ridge police officers remained on the scene until they had packed up all the items and loaded them into their vehicles. The family then took the belongings to their unoccupied Joyce Avenue rental property to place them in the storage shed at the rear of the property. After Mr. Solomon and RJ had left, Mrs. Solomon and her two daughters were organizing the shed when they heard the Defendant approaching in his vehicle. Mrs. Solomon explained that it was the Defendant's habit to play his car radio at an excessively loud volume, which made it possible to hear him when he was still a block away. She said she had a handgun carry permit and regularly carried her own handgun with her. She stated that the Defendant had repeatedly threatened the family and earlier that day had driven past their Fay Street residence several times. Therefore, when she heard his approach, she told Jacqueline to hand her her gun, which was on a shelf of the storage shed. She also directed Jacqueline to call the police and Kallie to call Mr. Solomon.

Mrs. Solomon testified that the Defendant pulled up in a black Nissan Altima, stopped in the street just past their driveway, and got out of the vehicle screaming. The Defendant was carrying a black handgun and began walking down the drive to the carport. She began walking toward him, carrying her gun in her right hand down by her side as she repeatedly told him that the police had been called and he needed to leave the property. The Defendant raised his handgun, which she thought was a revolver, pointed it directly at her chest, and said, "All three of you f***ing b****es are about to die." The Defendant also pointed his gun at Jacqueline and Kallie, who had exited the shed, while repeatedly yelling that all three of them were about to die and, directed at Jacqueline, "B****, you're going to give me my s**t."

Mrs. Solomon testified that she raised her own gun, pointed it at the Defendant, and told him again to leave. She said she was confident that the Defendant would have killed Jaqueline if he had had the chance and that she was determined to die herself before she let him get close to her daughters. She said the Defendant turned to leave at about the same moment that her husband pulled up to the house. She screamed to her husband that the Defendant had a gun and watched as her husband exited his pickup truck with his gun in his hand. She saw the Defendant run to his vehicle, get inside, and take off down the street

with her husband in pursuit in his truck. A short time later, she saw the Defendant passing their Fay Street residence in his vehicle with her husband following behind him in his truck. After her husband had returned home and the police had taken a report and left, she saw the Defendant drive past their home twice more. On one of those occasions, she saw someone else with the Defendant in his vehicle, as well as a second vehicle that contained four of the Defendant's friends.

When asked how she felt when the Defendant pointed his gun at her, Mrs. Solomon repeated that she thought her daughters were about to be killed and that she was prepared to die herself in order to protect her children. She said she had never before had a gun pointed at her or pointed her own gun at anyone. She stated that all three of them were crying, Jaqueline was also screaming, and Kallie was so traumatized that she later had to seek medical treatment for her anxiety. To the current day, Kallie expressed fear whenever she heard the sound of an approaching vehicle with a loud radio, always asking if it was the Defendant returning.

On cross-examination, Mrs. Solomon estimated that the police officers who responded remained at their home for approximately twenty minutes. She said they did not interview Kallie. She acknowledged that her husband had been violent in the past and that she had obtained an order of protection against him based on his having held a knife to her throat and beaten her. She said she had since had the order of protection set aside because she wanted Mr. Solomon's assistance in protecting their family from the Defendant. After a portion of one of Jacqueline's 911 calls was replayed, she acknowledged that Jacqueline told the 911 operator that the Defendant and Mr. Solomon were shooting at each other, which was not true. On redirect examination, she testified that the allegations she made against her husband were part of her divorce proceedings against him, which she had initiated after the events at issue in the case transpired.

Fourteen-year-old Kallie Solomon testified that on the day of the incident, the Defendant pointed a gun at her, her mother, and her sister and said that all three of them were going to die, which scared her. She said she saw the Defendant again later that same day on two different occasions.

Ronald Solomon testified that in the two weeks before the incident, the Defendant repeatedly drove past their home and called ten to fifteen different times threatening to shoot up their house and to kill everyone inside. He said he attempted "to manipulate" the Defendant by being "nice to him" in order to get Jaqueline's belongings returned to her. The Defendant, who was not receptive, threatened to kill him, his wife, and his daughters, and to "have his boys do a drive-by" shooting. The Defendant also drove by their home several times on the morning of the incident.

- 4 -

Mr. Solomon testified that his wife called the police that morning to report the Defendant's behavior. The Defendant disappeared when officers arrived, and the Knoxville police officers remained at their home until the family departed for Oak Ridge. Oak Ridge police officers met them at the Oak Ridge apartment and remained with them while a locksmith opened the door and the family removed Jacqueline's property and loaded it in their vehicles. The family then drove to the Joyce Avenue property and unloaded the items at the storage shed. Mr. Solomon's son left, and the remaining family members began reorganizing the shed. Because they had not seen the Defendant since that morning and everything appeared to be calm, Mr. Solomon left to purchase tomato plants.

Mr. Solomon testified that he was returning from the store when he saw the Defendant's black Nissan stopped in the street in front of the Joyce Avenue house. He said he accelerated down the street and arrived to find the Defendant in the middle of the driveway jumping up and down and screaming with his gun pointed at Mrs. Solomon, Jacqueline and Kallie. He then saw the Defendant turn, run to the mailbox, and begin kicking the mailbox to the ground.

Mr. Solomon, who also had a handgun carry permit, testified that he pulled his truck up to block the Defendant's Nissan, grabbed his Glock 22 handgun, and opened the door to his truck. The Defendant saw him, ran to the other side of his truck, and managed to squeeze into the driver's seat of his Nissan and take off.

Mr. Solomon testified that he got back inside his truck and followed because he was tired of the Defendant's threats to his family and wanted him caught. He said the Defendant pointed his gun at him both before he got back inside his Nissan and as he was driving the vehicle from the scene. He stated that the Defendant had a passenger with him in the vehicle, but it was the Defendant who pointed his gun out the driver's window behind him as Mr. Solomon followed him in his pickup truck.

Mr. Solomon described his vehicular pursuit of the Defendant and how the Defendant at one point turned his Nissan and began speeding toward Mr. Solomon's truck as if to ram it, but stopped, reversed, and fled again when Mr. Solomon "jumped out, and thr[e]w down on him." He also described the Defendant's attempts to elude him, the Defendant's driving past the Solomon residence with him still in pursuit, and his cell phone conversation with a 911 dispatcher, who kept telling him to stop following the Defendant. He stated that after he had relayed the Defendant's license plate number to the 911 dispatcher, he eventually went home to check on his family and to wait for the police. Shortly after the responding police offices had taken their report and left, the family again heard the sound of the Defendant's approaching car radio. Mr. Solomon testified that he stood in the carport with his gun at his side and watched as a black Dodge Charger with three men inside stopped at the curve of the street. The Defendant pulled up behind them

in the Nissan, and the men in the Charger then slowly drove past their home with the laughing and giggling Defendant following behind in his vehicle.

Mr. Solomon estimated that it took approximately twenty-five to thirty minutes at the speed limit to reach Jacqueline's Oak Ridge apartment from his home. To his knowledge, the Defendant drove by the Solomon home only once after the police had completed their report and left. When asked how he felt when the Defendant pointed his gun at him, he said that he would not say that he was not scared, but his "main goal was [his] family and ending this ridiculousness[.]"

Mr. Solomon testified that during a court recess earlier that day, he was exiting the men's restroom when he saw the Defendant following Kallie and heard his wife scream, "He's following her." The next thing he knew, the Defendant had turned around and said to him, "F*** you. I'll kill you." He said that Kallie had been headed to the women's restroom, which was several feet beyond the men's, and that the Defendant had passed the men's restroom and was within five feet of Kallie when he saw him. He stated that another man, whom he knew casually from attending the same church in 2011, was present and overheard the Defendant's remark.

On cross-examination, he acknowledged that in his sworn statements in his divorce proceedings, he had accused his wife of fabricating allegations against him and coaching their daughter, Kallie, on what to say. He said the Defendant's gun appeared to him to be a semi-automatic, smaller-caliber gun, similar to a .25. He acknowledged that his wife testified that she thought the gun was a revolver but said that his knowledge of guns was much more extensive than hers and that he could tell by its shape that the gun was not a revolver.

Officer Alexander Velez of the Oak Ridge Police Department testified that on April 28, 2018, he was searching for the Defendant and his vehicle, spotted him standing beside the vehicle on South Purdue Street, drew his weapon, and took the Defendant into custody. He said he found a .40 caliber bullet in the Defendant's pants pocket but did not find any weapons on the Defendant's person or in the vehicle. He testified that when he turned the Defendant over to the Knoxville Police Department, he asked if they wanted the bullet, and they told him they did not. He, therefore, disposed of the bullet. He estimated that it would take approximately twenty-five to thirty minutes at normal speeds to drive from West Knoxville to the location of the Defendant's arrest but agreed that the trip could be completed faster at higher speeds. He testified that the route between West Knoxville and the location of the Defendant's arrest passed over a bridge that spanned a small river.

On cross-examination, he testified that he arrested the Defendant at approximately 3:37 p.m. He acknowledged that he would have searched any obvious areas, including

glove compartment, center console, seat pockets, and trunk, during his inventory search of the Defendant's vehicle.

James Harper of the Knox County Codes Administration and Fire Bureau, whose office was on the fifth floor of the courthouse building and whose testimony occurred on the day after Mr. Solomon's, testified that the previous afternoon he had just left the men's restroom when he saw Mr. Solomon, who had attended his church years earlier. He stated that he was chatting with Mr. Solomon when he noticed a man, later identified as the Defendant, trying to catch up with a young girl who was walking down the hall. As the Defendant passed, he heard him say, "I'm going to f'ing kill you." When he turned, he saw the girl go into the women's restroom and the Defendant start to enter after her. Concerned, he called, "Hey," and the Defendant stopped, came back, and entered the men's restroom. Mr. Solomon told him who the Defendant was, and Mr. Harper flagged down an officer to report the incident.

On cross-examination, Mr. Harper testified that he did not hear Mrs. Solomon scream. He said his attention was focused on the Defendant's approach to the women's restroom because it appeared that there was "a domestic issue occurring." He stated that the Defendant had his hand on the women's restroom door at the moment that he called "Hey" to stop him. He testified that the Solomons had attended his church for approximately two years, but, prior to the previous day, his last encounter with Mr. Solomon had been a casual greeting during a chance encounter approximately five years earlier.

As its final proof, the State introduced certified judgments of conviction against the Defendant that reflected the following prior felony convictions: a 2012 Knox County conviction for simple possession, casual exchange; a 2012 Knox County conviction for failure to appear; a 2013 Knox County conviction for simple possession, casual exchange; an April 20, 2001, Michigan conviction for attempted possession with intent to deliver cocaine; a September 21, 2001, Michigan conviction for larceny from a person; a July 25, 2002, Michigan conviction for breaking and entering a building with the intent to commit a larceny; and a June 14, 2004, Michigan conviction for "felony firearm."

Curtis Phillips, who lived directly across the street from the Joyce Avenue rental property, testified that he heard a commotion on the afternoon of April 28, 2018, looked out his living room window, and saw the daughter of the property owners engaged in a verbal altercation with the Defendant, who was inside a vehicle stopped on the street. He said the Defendant took off in his vehicle but returned almost immediately to resume the verbal altercation. He then saw the woman's father running down the driveway toward the Defendant. The Defendant sped off, followed by the father in his pickup truck. He never

saw any of the parties with a weapon. On cross-examination, he acknowledged that he did not have a clear line of sight to the carport area.

Jacqueline Solomon testified that when she moved out of the apartment she shared with the Defendant, she took the Defendant's keys to his BMW, his identification, and his social security card. She said the Defendant called asking her to return them, but she refused. At approximately 1:00 p.m. on April 28, 2018, she was with her mother and sister in the back yard of the Joyce Avenue property when the Defendant pulled up to the property, got out, walked down the driveway, and began arguing with her about the return of his belongings. Mrs. Solomon saw the Defendant, pulled out her gun, and told Kallie to call Mr. Solomon. Mr. Solomon pulled up a short time later and got out of his truck with his gun drawn. The Defendant kicked over the mailbox and then took off in his car with Mr. Solomon chasing him. According to Jacqueline, the Defendant was carrying a beer can when he first approached her in the driveway. She said he never had a gun.

Jacqueline testified that she called 911 and said that the Defendant had a gun because she feared that her father would hurt him and she thought the police response would be quicker if she said the Defendant was armed. She stated that in an earlier incident, Mr. Solomon had armed himself with an assault rifle to wait on the front porch of the family residence for the Defendant to drive by their home. She denied that the Defendant told her what to say or threatened her to testify on his behalf, and she insisted that her trial testimony was the truth.

On cross-examination, she denied that the reason she had moved out of the Oak Ridge apartment was because the Defendant had beaten her, and she agreed that she had been lying when she told the 911 operator that the Defendant had beaten her, that he had a gun, and that he had threatened to kill her, her mother, and her sister. She acknowledged that the Defendant had called her from the jail immediately following his arrest, as well as multiple additional times, in violation of a no contact order. She agreed that the Oak Ridge police had found a hidden compartment in her vehicle, which she had reported to the police as stolen by the Defendant. She conceded that she had testified under oath at the Defendant's bond hearing that she was a liar. Finally, she testified that she loved the Defendant and that her mother, sister, and father, who had never liked him, all lied during their testimony.

The Defendant testified that Jacqueline took his Social Security card, identification card, birth certificate, keys and title to his BMW vehicle when she moved out of their apartment. He said he made repeated calls seeking the return of his property and believed that he and Mr. Solomon had arranged for Jacqueline to return his items when she retrieved the rest of her belongings from their apartment. However, when he returned to the apartment on April 28, 2018, after she and her family had retrieved her belongings, he

found that she had not left any of his items. Upset, he jumped in his borrowed Nissan and drove to Knoxville, where he saw Jacqueline and her mother in the back yard of the Joyce Avenue property. He said he threw his vehicle into park, got out, began walking down the driveway, and said to Jacqueline, "You got your s**t back. Now give me my s**t." Jacqueline began to approach him to talk, but her mother stopped her and told him to leave and that she was going to call the police.

The Defendant testified that he told Mrs. Solomon that she could call the police and that he wanted his stuff back. He said he kept walking down the driveway, but Mrs. Solomon and Jacqueline ran into the shed and shut the door, which angered him. He then threw down the can of lemon-lime margarita he had been carrying in his hand, turned, walked back to his vehicle, and got inside. As he sat there, he grew angrier as he thought about how they had tricked him, so he got out of his vehicle and began kicking over their mailbox. After his final kick, which toppled the mailbox, he felt something against his leg and looked up to see that Mr. Solomon had driven his pickup truck up against him and was holding a gun out the driver's window. At that point, he ran around the truck, got back in his vehicle, and took off.

The Defendant testified that Mr. Solomon chased him in his pickup truck for five to seven minutes. He said he initially circled back around to the Joyce Avenue house because he could not believe what was happening. He took off again, however, and eventually returned to Oak Ridge, where he was arrested. The Defendant acknowledged that he had driven past the Solomon residence earlier in the day and said it was to search for his missing BMW. He denied that he ever had a gun or that he ever attempted to ram Mr. Solomon's pickup truck. He testified that the bullet the Oak Ridge officer found in his pocket was not a functional bullet, but part of a piece of jewelry that belonged to the man who owned the Nissan. He claimed that the chain on which the bullet hung was in his pants pocket with the bullet, but the officer did not pull the chain out of his pocket during the search.

On cross-examination, the Defendant conceded his guilt of the felony convictions the State had admitted into evidence, with the exception of one Michigan drug conviction, which he claimed was a conviction by someone with the same first and last name whose record had been confused with his. He acknowledged that he did not call the police on the day of the incident to report that Mr. Solomon was following him with a gun. He further acknowledged that he had repeatedly violated the court's no contact order by calling Jacqueline every day that he was in jail following his arrest. He adamantly denied that he threatened Mr. Solomon in the hallway during the trial break, was following Kallie to the restroom, or attempted to enter the women's restroom.

On redirect examination, the Defendant testified that Jacqueline accepted his telephone calls from the jail, wrote him regular letters and emails while he was jailed, and

initiated contact with him after his release from jail. He said he had pled guilty in each of his prior convictions, taking accountability for his actions. He explained that his Michigan conviction for felon in possession of a firearm occurred when he was stopped by the police when he was en route to sell his gun to raise money to purchase a car seat for his new baby. On recross-examination, he acknowledged that at the time of that conviction, he had been under a court order not to own any firearms.

As his final proof, the Defendant introduced the courthouse surveillance video of the lobby and hallway areas outside the courtroom.

## ANALYSIS

### I. Trial Court's Response to Hallway Threat

The Defendant contends that the trial court erred by holding an improper, sua sponte hearing to address the alleged hallway threat, in violation of Rules 404 and 614 of the Tennessee Rules of Evidence; by improperly revoking his bond at the conclusion of the hearing, in violation of the standards promulgated in State v. Burgins, 464 S.W.3d 298 (Tenn. 2015); and by allowing evidence of the alleged threat to be introduced at trial. The State responds that the trial court acted appropriately by holding a jury-out hearing to address the extraordinary circumstance raised by the Defendant's threatening of the witness, that the Defendant's appeal of his bond revocation is moot given his convictions, and that the trial court properly exercised its discretion in admitting the evidence.

### A. Sua Sponte Hearing and Court's Calling of Witnesses

The Defendant first complains about the trial court's having acted on its own initiative in holding the jury-out hearing. The Defendant argues that the trial court overstepped its authority and "violated Rules 404 and 614" in initiating what amounted to a 404(b) hearing without request from either party and by calling lay witnesses, Mr. Solomon and Mr. Harper, "in unextraordinary circumstances."

Tennessee Rule of Evidence 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

- 10 -

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Other purposes" include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. See State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004). If the trial court substantially complies with the procedural requirements of Rule 404(b), we review its determination for an abuse of discretion. State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005).

Tennessee Rule of Evidence 614 "Calling and Interrogation of Witness by Court," provides:

a) Calling by Court. -- The court may not call witnesses except in extraordinary circumstances or except as provided for court-appointed experts in Rule 706, and all parties are entitled to cross-examine witnesses thus called.
(b) Interrogation by Court. -- The court may interrogate witnesses.
(c) Objections. -- Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present.

Tenn. R. Evid. 614. When questioning witnesses, the trial court should "avoid giving 'the jury any impression as to [the trial court's] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury.'" State v. Charles Montague, No. 03C01-9306-CR-00192, 1994 WL 652186, at *5 (Tenn. Crim. App. Nov. 21, 1994), perm. app. denied (Tenn. April 10, 1995) (quoting State v. Suttles, 767 S.W.2d 403, 406 (Tenn. 1989)).

The record reflects that the trial court held the jury-out hearing upon being informed by the bailiff that "an officer overheard [the Defendant] threaten one of the alleged victims in this case." When questioned by the court, Mr. Solomon and Mr. Harper each testified about the incident that had just transpired in the hallway. At the conclusion of its voir dire of each witness, the court afforded both the State and the Defendant the opportunity for cross-examination. The court also inquired whether either party had any additional witnesses for the hearing. Both responded in the negative, but the State requested, over the objection of the Defendant, that it be allowed to add Mr. Harper as a trial witness.

- 11 -

After a brief recess to consider the issue, the court found that there was clear and convincing evidence that the Defendant made the statement, and that the statement was relevant to the issue of the Defendant's intent to cause the victims to reasonably fear imminent bodily injury by his use of the gun on April 28, 2018. The court found that it was a close call as to whether the probative value of the evidence outweighed the danger of unfair prejudice and, therefore, reserved its final ruling on the admissibility of the evidence pending the development of the proof at trial. In the meantime, based on the clear and convincing proof that the Defendant threatened a witness, the court ordered that the Defendant's bond be revoked until the conclusion of the trial, stating that it was "not going to tolerate such statements during a trial."

When defense counsel began cross-examining Mrs. Solomon about her husband's violent acts toward her, the State objected. The trial court sustained the objection and held a bench conference at which it warned defense counsel that if she introduced evidence of Mr. Solomon's character for violence, it would "most likely open the door" to character evidence of the Defendant. After consultation with her client, defense counsel announced that she wanted to proceed with her questions. Before she proceeded, the trial court made it clear that if she did so, the court would allow the State to introduce evidence of the hallway threat:

> [PROSECUTOR]: I believe that's going to fully open the door for this incident that happened over break, if we do that.
> THE COURT: That's what I just said. I said - -
> [PROSECUTOR]: Okay. I just want to make sure that we're clear about that.
> THE COURT: It changes the analysis under 404(b), to one it raises (inaudible) so - -
> [PROSECUTOR]: I just - - (inaudible) - - okay. All right.

Before Mr. Solomon's testimony, the trial court issued its official ruling on the 404(b) issue:

> Oh, yeah, the 404 thing. All right. So the Court ruled earlier about the alleged threat toward Mr. Solomon in the hall today, that I was going to keep it out under 404(a) because I did not think that the level of probative value was as great as the danger of unfair prejudice.
>
> I think the analysis has now changed, that the Defense has explored the character of Mr. Solomon as a violent person, which is only relevant self-defense-type proceeding, which is where I think we're going on this thing. So that's why I let that in. But when I let that in, it increased the probative

- 12 -

value in his mind a great deal about what happened today, because it goes to the intent of [the Defendant] when he was there.

Was he acting in self-defense? Was - - did he have a gun in the first place? Did he threaten the Solomons with it? And so motive and intent is highly relevant now, especially when we're talking about a potential self-defense argument here. If the Defendant is making threats to the Solomons now with expressing a desire to kill them, then that is certainly relevant about his state of mind.

Even though it's a subsequent event, I think it is relevant to his intent back then. It may not be the only explanation. There may be some - - maybe it didn't happen. Maybe he has some innocent explanation to it, like this anger develop[ed] because they lied about it. Who knows? But in any event, I think the probative value has now increased. So I'm going to allow the State to present proof about the alleged threat today toward Mr. Solomon.

Tennessee trial courts possess the inherent power to supervise and control the proceedings in their courts. State v. Welch, 586 S.W. 3d 399, 404 (Tenn. Crim. App. 2019) (citing State v. Bragan, 920 S.W. 2d 277, 239 (Tenn. Crim. App. 1995)); Hodges v. Att'y Gen., 43 S.W.3d 918, 921 (Tenn. Ct. App. 2000). "It is well-established that a trial judge has broad discretion in controlling the course and conduct of the trial, and that in exercising that discretion, he or she must be careful not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial." State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994) (citing State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993)). Having been informed that the Defendant had allegedly just threatened a victim-witness in the hallway, the trial court acted appropriately and within its authority by holding an immediate jury-out hearing to inquire into the incident. Because the proceeding, including the trial court's questioning of the witnesses, took place outside the presence of the jury, there was no danger that the court's questioning of the witnesses would lead the jurors to infer that the court favored one side over the other. Moreover, as the State points out, while Rule 404(b) requires a trial court to hold a jury-out hearing upon request by a party, it does not preclude a trial court from holding a hearing on its own initiative. We, therefore, conclude that the trial court did not exceed is authority or violate Rules 404 and 614 by the sua sponte out-of-court hearing and examination of witnesses.

## B. Revocation of Bond

The Defendant contends that the trial court violated his due process rights by revoking his bond at the conclusion of the hearing "without following any of the procedural requirements enumerated in Burgins." In Burgins our supreme court held that a defendant

is entitled to certain procedures in a pretrial bond revocation hearing, including written notice of the alleged grounds for revocation, disclosure of the evidence against him or her, a meaningful opportunity to be heard and to present evidence, the right to confront and cross-examine witnesses, and the right to make argument in his or her defense. Burgins, 464 S.W.3d at 310.

The Defendant complains that he was not given "proper notice" of the hearing, had no time to investigate the claim, and was deprived "of the opportunity to meaningfully respond." The State argues that because the Defendant is now a convicted felon without a constitutional right to bail, this court cannot provide him any relief under Burgins, and, thus, that the Defendant's appeal of his bond revocation is moot.

We agree with the State. "A moot case is one that has lost its character as a present, live controversy. The central question in a mootness inquiry is whether changes in the circumstances existing at the beginning of the litigation have forestalled the need for meaningful relief." McIntyre v. Traughber, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994) (citations omitted); see State v. Wright, 836 S.W. 2d 130, 136 (Tenn. Crim. App. 1992) (concluding that appellant's issue regarding denial of his request for an appeal bond was moot not only because the appellant was indicted for other offenses subsequent to his conviction in the case but also because his convictions in the case at bar were affirmed). The Defendant's convictions render the mid-trial revocation of his bond moot.

## C. Admission of Hallway Threat under Rule 404(b)

The Defendant contends that the trial court erred in admitting the evidence of the hallway threat under Rule 404(b), arguing that: there was not clear and convincing evidence that he made the threat; the alleged threat was not relevant and material to his intent on April 28, 2018; and the danger of unfair prejudice caused by the admission of the evidence outweighed any probative value it may have had. The State responds by arguing that the trial court properly found that the threat was relevant to the Defendant's intent to commit the aggravated assaults and that its probative value outweighed the danger of unfair prejudice.

The Defendant cites minor discrepancies in Mr. Solomon's and Mr. Harper's accounts of the threat, as well as the highly pixelated, constantly panning courthouse security video, which presumably showed the two men talking after the alleged threat, to suggest that the two men had a closer relationship than they claimed and might have conspired to fabricate the incident. The trial court, however, heard their testimony and found them to be credible, as was within its province.

The Defendant further argues that the State failed to show a sufficient logical connection between the charged offenses and the threat, and that, even if relevant to his intent, the danger of unfair prejudice of the evidence was higher than any probative value, given the great risk that the jury would consider it as propensity evidence.

We disagree. The evidence was relevant, and, given the development of the proof at trial, highly probative to show that the Defendant's intent was to cause the victims to fear imminent bodily injury by his use or display of the gun on April 28, 2018. We, therefore, conclude that the trial court acted within its discretion in admitting the evidence. See State v. Ralph Alan Stanley, No. M2016-02546-CCA-R3-CD, 2018 WL 1391628, at *8-9 (Tenn. Crim. App. Mar. 20, 2018), perm. app. denied (Tenn. July 18, 2018) (noting that "'Rule 404(b) would permit the introduction of evidence of subsequent acts to establish one's intent during a prior act in appropriate cases'" in affirming the trial court's determination that the threats a defendant made to a victim after the initial crime were relevant and admissible to show the defendant's motive and intent to commit the crime) (quoting State v. Elkins, 102 S.W.3d 578, 584 (Tenn. 2003)); State v. Marilyn Jean Jones and William Dwight Homesley, 1987 WL 16068, at *2 (Tenn. Crim. App. Aug. 26, 1987), perm. app. denied (Tenn. Nov. 9, 1987) (concluding that the trial court did not err in its mid-trial revocation of a defendant's bail following defendant's threat of a witness, or in later admitting evidence of the threat at trial).

## II. Admission of 911 Calls, Testimony about Bullet, and Michigan Convictions

The Defendant next contends that the trial court committed reversible error in admitting unredacted 911 calls, evidence of the bullet that the police failed to preserve, and the Defendant's Michigan convictions. The State responds by arguing, among other things, that the Defendant has waived his issue with respect to the admission of the 911 calls by failing to make a contemporaneous objection at trial or to provide an adequate record for review, that the trial court properly found that the Defendant failed to show that the bullet had any exculpatory value, and that the Michigan judgments were appropriately admitted after the trial court found that they were authenticated.

When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R.

Evid. 403. An appellate court generally reviews a trial court's decisions regarding the admissibility of evidence for an abuse of discretion. State v. Davis, 466 S.W.3d 49, 61 (Tenn. 2015) (citation omitted). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. Id. (citations omitted).

## A. Admission of 911 Calls

The Defendant contends that he was unfairly prejudiced by the admission of the 911 calls, which were not redacted to eliminate Jacqueline Solomon's accusations against the Defendant of vehicle theft, possession of drugs and guns, and domestic abuse. The State argues that the Defendant has waived this issue by failing to make a contemporaneous objection at trial and by failing to ensure an adequate record for appellate review. We agree with the State.

The record reflects that defense counsel failed to object to the publication of the 911 calls and answered that she had no objection when the trial court asked if either party objected to their admission into evidence. Generally, a defendant's failure to make a contemporaneous objection results in waiver of the issue on appeal. See Tenn. R. App. P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Here, the Defendant not only failed to raise an objection before the trial court, but also failed to ensure that an adequate record was included on appeal by including a reviewable recording of the 911 calls.[2] We, therefore, conclude that the Defendant has waived the issue on appeal, and that plain error review is unwarranted. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (recognizing that the existence of all five State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994), factors must be met before a court will find the existence of plain error).

## B. Testimony about the Bullet

The Defendant next contends that the trial court erred in admitting the Oak Ridge police officer's testimony about the bullet he found in the Defendant's pocket, which the State failed to preserve for trial. The Defendant argues that "[t]he State's presenting testimony of disputed evidence due to its own failure to preserve evidence effectively stripped the Defendant of his right to possible exculpatory evidence." The State argues that the trial court correctly determined that the physical bullet was not constitutionally material to the Defendant's defense. We agree with the State.

---

[2] As the State observes, the CD that is included in the record is either blank, or unplayable.

Prior to trial, the Defendant filed a "Motion to Dismiss and/or Suppress Evidence" based on the fact that the bullet found in his pocket was no longer available. Relying on State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), the Defendant argued that the State was negligent for not retaining the bullet and that its failure to do so unfairly prejudiced his defense and required either dismissal of the indictment or suppression of evidence of the bullet at trial. The trial court denied the motion, finding that, based on the limited evidence before the court at that time, the Defendant failed to show that the bullet constituted exculpatory evidence that was constitutionally material. The court further found that, even if the State failed in a duty to preserve the bullet, its failure was the result of simple negligence that might, at most, warrant the Tennessee Pattern Jury Instruction on the destruction of evidence, depending on the development of the proof at trial. The transcript of the trial court's instructions to the jury is not included in the record, but the typewritten jury instructions from which the trial court presumably read is included as an exhibit. Included in those instructions is the pattern jury instruction on the State's duty to preserve evidence.

In Ferguson, our supreme court adopted a balancing approach for courts to use to determine when the State's loss or destruction of evidence has deprived a defendant of his fundamental right to a fair trial. Ferguson, 2. S.W.3d at 917. Under this approach, a court must first determine whether the State had a duty to preserve the evidence. Id. The State's duty to preserve evidence is "'limited to evidence that might be expected to play a significant role in the suspect's defense.'" Id. (quoting California v. Trombetta, 467 U.S. 479, 488-80 (1984)). To be considered constitutionally material, "'evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" Id. (quoting Trombetta, 467 U.S. at 488-89).

If the court determines that the State had a duty to preserve the evidence, the court must next consider several factors, including the degree of negligence involved in the destruction of the evidence, the significance of the evidence, and the sufficiency of the evidence in the case, to determine if the missing evidence would result in a trial that is fundamentally unfair to the defendant. Id. If the court determines that a trial without the missing evidence would be fundamentally unfair, it may, depending on the facts and circumstances of the case, dismiss the charges or "craft such orders as may be appropriate to protect the defendant's fair trial rights." Id. Among the options available to a trial court is to issue a jury instruction regarding the missing evidence. Id.

We find no error in the trial court's ruling or in the manner in which it handled this issue. We, first, agree that the Defendant was unable to show that the bullet was constitutionally material to his defense. Even had the Defendant been able to demonstrate that the bullet was part of a piece of jewelry, there was still strong evidence, in the form of

- 17 -

eyewitness testimony of Mr. and Mrs. Solomon and Kallie Solomon, that the Defendant possessed a handgun that he pointed at the victims. On this latter point, we note that the two adult eyewitnesses described the gun as a either a revolver or a smaller caliber semi-automatic similar to a .32, rather than a .40 caliber weapon. Thus, the officer's testimony that he found a .40 caliber bullet in the Defendant's pants pocket added only minimally, if at all, to the State's case. Moreover, the Defendant arguably benefitted by the officer's disposal of the bullet, in that the State was prevented from presenting an expert witness to refute the Defendant's claim that the bullet was not functional.

Regardless, we further agree that even if the bullet was constitutionally material, no corrective action beyond an instruction to the jury was warranted, given the minor negligence involved in the bullet's disposal, its minimal significance to the defense, and the strong additional evidence that existed in the case. We, therefore, conclude that the trial court did not err in admitting the testimony about the bullet.

### C. Michigan Convictions

The Defendant contends that the trial court erred in admitting the Michigan judgments, arguing that they were not properly authenticated and that they were too confusing to be of any probative value. In support, he cites the trial court's comments about the confusing nature of the judgments, arguing that if the trial court was confused by them, "[i]t could only be reasonably expected that the jury would be confused" and that "[s]uch confusion of the jury would have substantially outweighed any probative value of the judgments." The State argues that the trial court properly exercised its discretion in admitting the certified copies of the Defendant's Michigan convictions. We agree with the State.

The record reflects that defense counsel objected at trial that the Michigan judgments were not properly authenticated because the clerk's certification and seal was not on each page of the documents. Defense counsel also argued that two of the judgments appeared to relate to the same offense of felony firearm and would lead the jury to believe that the Defendant had two prior felony firearm convictions instead of just one. During its review, the trial court observed that Michigan judgments were confusing and said that it believed the Michigan courts prepared separate judgments for the same offense when a defendant received a sentence involving a combination of confinement and release on probation. The trial court concluded, however, that the risk of confusion to the jury was minimal because the Defendant was charged with only one prior felony firearm conviction. After removing three pages from the packet that related to the Defendant's probation violation and settlement conference, the trial court admitted the judgments. We conclude that the trial court acted within its discretion in admitting the Michigan judgments.

### III.  Sufficiency of the Evidence

Finally, the Defendant contends that the evidence was insufficient to sustain his felony convictions, arguing that there was insufficient proof that he had a gun or that the alleged victims were in fear.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).  Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

### A. Firearm Convictions

In support of his contention that there was insufficient proof that he possessed a gun during the April 28, 2018 incident, the Defendant cites Mr. and Mrs. Solomon's varying descriptions of the weapon, the fact that no gun was found on his person or in his vehicle, and his own, Jacqueline's and the neighbor's testimony that he did not have a gun.  The State points out that credibility determinations are within the province of the jury, and argues that the testimony of Mr. and Mrs. Solomon and Kallie was sufficient for the jury to find beyond a reasonable doubt that the Defendant was in possession of a gun.

We agree with the State.  When viewed in the light most favorable to the State, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that the Defendant was in possession of a handgun on the afternoon of April 28, 2018, and that he

had been previously convicted of the qualifying felonies for the firearms offenses. Accordingly, we conclude that the evidence was sufficient to sustain his firearms convictions.

### B. Aggravated Assault Convictions

The Defendant's aggravated assault convictions were based on his having intentionally or knowingly caused the victims to reasonably fear imminent bodily injury by his use or display of the gun. See Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). In support of his contention that there was insufficient evidence that the victims felt fear, the Defendant cites the fact that neither Mrs. Solomon nor Jacqueline testified that they were afraid. He acknowledges that Kallie Solomon testified that she was scared, but suggests that she was unduly influenced in her testimony by her mother, who testified before her.

We agree with the State that there was sufficient evidence by which the jury could conclude that all three victims were in fear of imminent bodily injury when the Defendant pointed his handgun at them. Although Mrs. Solomon did not directly testify that she was afraid, she said that she believed that her daughters were about to be killed, that she was determined to die herself to protect them, and that all three of them were crying during the ordeal. Jacqueline, testifying on the Defendant's behalf, denied that the Defendant ever had a gun. However, as the State points out, it was within the province of the jury to disbelieve her trial testimony and to conclude that she was in fear of imminent bodily harm based on the testimony of the other witnesses and what Jacqueline herself told the 911 operator in her calls for help. We, therefore, conclude that the evidence is sufficient to sustain the Defendant's convictions for aggravated assault.

### CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

- 20 -